FILED

2009 OCT 30  PM 4: 11

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1    Mark Labaton  (Bar No. 159555)
     KREINDLER & KREINDLER LLP
2    707 Wilshire Boulevard
     Los Angeles, CA 90017
3    Telephone: (866) 386-2531
     Facsimile.: (213) 622-6019
4    mLabaton@kreindler.com

5
     Hollis L. Salzman
6    Kellie Lerner
     LABATON SUCHAROW LLP
7    140 Broadway
     New York, NY 10005
8    Telephone: (212) 907-0700
     Facsimile: (212) 818-0477
9

10   Mark Shane
     SHANE AND WHITE, LLC
11   1676 Route 27
     Edison, NJ 08817-3449
12   Telephone: (732) 819-9100
     Facsimile: (732) 572-9641
13

14   *Attorneys for Plaintiff Craig Kennedy and*
     *the Proposed Class*
15

16              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
17

18   CRAIG KENNEDY, individually and on        )
     behalf of all others similarly situated,  )   CV09  07985 DDP(CWx)
19                                             )   Case No.:
                         Plaintiff,            )
20                                             )   CLASS ACTION COMPLAINT
            vs.                                )   FOR VIOLATION OF THE
21                                             )   FEDERAL ANTITRUST LAWS
     NATIONAL ASSOCIATION OF MUSIC             )
22   MERCHANTS, INC.; GUITAR CENTER,           )   DEMAND FOR JURY TRIAL
     INC.; YAMAHA CORPORATION OF               )
23   AMERICA; FENDER MUSICAL                   )
     INSTRUMENTS CORPORATION; and              )
24   GIBSON GUITAR CORPORATION,                )
                                               )
25                       Defendants.           )
                                               )
26   _____)

27

28

     _____
     CLASS ACTION COMPLAINT

Plaintiff, Craig Kennedy, on behalf of himself and all others similarly situated, brings this action for treble damages, injunctive relief, and costs of suit under the antitrust laws of the United States against National Association of Music Merchants, Inc.; Yamaha Corporation of America; Fender Musical Instruments Corporation; Gibson Guitar Corporation; and Guitar Center, Inc. ("Defendants"), and alleges as follows:

## NATURE OF CLAIM

1.     "Fretted Instrument Products" are fretted musical instruments[1] such as acoustic and electric guitars, banjos, ukuleles, and mandolins, as well as amplifiers, strings, and other accessories for those instruments.

2.     Defendants illegally conspired to secure higher price levels of Fretted Instrument Products, and thereby restrict retail price competition, or eliminate price discounting entirely.

3.     Plaintiff, a consumer and a direct purchaser of a guitar from one of the Defendants, brings this action on his own behalf and on behalf of a class of purchasers of Fretted Instrument Products who purchased between January 1, 2005 and December 31, 2007.

4.     In March 2009, the Federal Trade Commission ("FTC") issued a cease and desist order to the National Association of Music Merchants, Inc. ("NAMM") alleging that between 2005 and 2007, NAMM organized various meetings and programs for its members, including Defendants, at which retailers of musical instruments were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing, and restrictions of retail price competition, in violation of Section 5 of the Federal Trade Commission Act, as amended 15 U.S.C. § 45 ("Section 5").

---

[1] A fret is a raised portion on the neck of a stringed instrument, that extends generally across the full width of the neck.

CLASS ACTION COMPLAINT

5.     At the same time, the parties settled the FTC's charges that NAMM "violated federal law by enabling and encouraging the exchange of competitively sensitive price information among its members," in violation of Section 5.  Press Release, *Federal Trade Commission Nat'l Ass'n of Music Merchants Settles FTC Charges of Illegally Restraining Competition* (Mar. 4, 2009), http://www.ftc.gov/opa/2009/03namm.shtm ("Mar. 4, 2009 Press Release").

6.     According to the FTC's press release announcing NAMM's settlement of "FTC Charges of Illegally Restraining Competition," "[t]he FTC's proposed consent order is designed to remedy NAMM's anticompetitive conduct." The Commission voted to accept the complaint and the consent order by a vote of 4-0. *Id.*

7.     Defendants' conduct is *per se* illegal under Section 1 of the Sherman Act.

8.     As a result of Defendants' anticompetitive conduct, Plaintiff and the Class purchased Fretted Instrument Products at artificially inflated prices.

9.     Plaintiff seeks damages and equitable relief under Section 1 of the Sherman Antitrust Act.

## JURISDICTION AND VENUE

10.     This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.

11.     This Court has jurisdiction under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c). Defendants reside, transact business, are found, or have agents in this District. Further, a substantial part of the events or omissions giving rise to the claims alleged occurred in the District.

**PARTIES**

13.    Plaintiff Craig Kennedy is a resident of Middlesex County, New Jersey.  Plaintiff purchased a guitar directly from one or more of the Defendants during the Class Period (defined below), and was injured as a result of Defendants' unlawful conduct.

14.    Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008.  NAMM is a trade association comprised of more than 9,000 members, including Defendants, that include manufacturers, distributors, and dealers of musical instruments and related products.  Most United States manufacturers, distributors, and dealers of musical instruments are members of NAMM.  NAMM is controlled by its members, including Defendants.  NAMM's basic mission is to unify, lead, and strengthen the music products industry in the U.S.  During the Class Period, NAMM permitted and encouraged would-be competitors to discuss strategies for implementing policies to unlawfully inflate prices of Fretted Instrument Products.

15.    Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California 91362.  Guitar Center is the largest retail seller of Fretted Instrument Products in the United States and is a NAMM member.  During the Class Period, Guitar Center, directly or through its subsidiaries or affiliates, sold Fretted Instrument Products to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.  Guitar Center is referred to as a "retailer Defendant."

16.    Defendant Yamaha Corporation of America ("Yamaha") is a California corporation with its principal place of business at 6600 Orangethrope Avenue, Buena Park, California 90620.  During the Class Period, Yamaha, a NAMM member, directly or through its subsidiaries or affiliates, manufactured

1  and sold Fretted Instrument Products to customers at anticompetitive prices which

2  were inflated by reason of Defendants' unlawful conduct.

3      17.    Defendant Fender Musical Instruments Corporation ("Fender") is a

4  Delaware corporation with its principal place of business at 8860 E. Chaparral

5  Road, Suite 100, Scottsdale, Arizona 85250.  During the Class Period, Fender,

6  directly or through its subsidiaries or affiliates, manufactured and sold Fretted

7  Instrument Products to customers at anticompetitive prices which were inflated by

8  reason of Defendants' unlawful conduct.

9      18.    Defendant Gibson Guitar Corporation ("Gibson") is a Delaware

10  corporation with its principal place of business at 309 Plus Park Boulevard,

11  Nashville, Tennessee 37217.  During the Class Period, Gibson, directly or through

12  its subsidiaries or affiliates, manufactured and sold Fretted Instrument Products to

13  customers at anticompetitive prices which were inflated by reason of Defendants'

14  unlawful conduct.

15      19.    Defendants identified in paragraphs 16-18 are collectively referred to

16  herein as "manufacturer Defendants."

## UNNAMED CO-CONSPIRATORS

18      20.    Various other companies and individuals not named as Defendants in

19  this Complaint participated as co-conspirators in the acts complained of, and

20  performed acts and made statements in furtherance of the unlawful conduct.

## CLASS ACTION ALLEGATIONS

22      21.    Plaintiff brings this action as a class action under Rules 23(a) and

23  (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others

24  similarly situated.  The Class is defined as:

> All individuals and entities who purchased one or more
> Fretted Instrument Product(s) from any of the Defendants
> between January 1, 2005 and December 2007 (the "Class
> Period").  Excluded from the Class are government
> entities, Defendants, and Defendants' parents,

1  subsidiaries, affiliates, or co-conspirators, whether or not
2  named in this Complaint.

3    22.   The Class is so numerous that joinder of all members is impracticable.
4  Due to the nature of the trade or commerce involved, Plaintiff believes that Class
5  members are geographically dispersed throughout the United States, and that
6  joinder of all Class members would be impracticable. While the exact number of
7  Class members is unknown to Plaintiff at this time, Plaintiff believes that there are
8  at least thousands of members of the Class and that their identities can be learned
9  from Defendants' and their co-conspirators' books and records.

10    23.   Plaintiff's claims are typical of the claims of the other members of the
11  Class. Plaintiff and the Class purchased Fretted Instrument Products during the
12  Class Period at artificially maintained, non-competitive prices, established by the
13  unlawful actions of Defendants and their co-conspirators. Plaintiff and the Class
14  have sustained damages in that they paid inflated prices for Fretted Instrument
15  Products during the Class Period due to Defendants' conduct, in violation of
16  federal law as set forth below.

17    24.   Plaintiff will fairly and adequately protect the interests of the Class
18  and has retained counsel competent and experienced in class action and antitrust
19  litigation.

20    25.   Common questions of law and fact exist as to all members of the
21  Class, which predominate over any questions affecting solely individual members
22  of the Class. Among the questions of law and fact common to the Class are:

23    (a)   Whether Defendants conspired with each other and their co-
24  conspirators and/or engaged in concerted action or unilateral action in restraint of
25  trade;

26    (b)   Whether Defendants intentionally and unlawfully engaged in a
27  scheme to control price and potential competitors from the relevant market;

28

1           (c)    Whether Defendants' unlawful conduct caused Plaintiff and the

2 Class to pay more for Fretted Instrument Products than they otherwise would have

3 paid;

4           (d)    The duration and extent of the combination or conspiracy

5 alleged herein;

6           (e)    The effect of the combination or conspiracy upon the prices of

7 Fretted Instrument Products sold in the United States during the Class Period;

8           (f)    Whether Plaintiff and the Class are entitled to declaratory,

9 equitable and/or injunctive relief;

10          (g)    Whether Defendants engaged in agreements, contracts,

11 combinations and conspiracies which had the purpose and/or effect of

12 unreasonably restraining competition and limiting purchasers' access to competing

13 and lower priced Fretted Instrument Products;

14          (h)    Whether Defendants undertook actions to conceal their

15 unlawful conspiracy; and

16          (i)    Whether Defendants' conduct violated the relevant federal

17 antitrust laws and caused injury to the business and property of Plaintiff and the

18 Class and, if so, the proper measure of damages.

19      26.    A class action is superior to other available methods for the fair and

20 efficient adjudication of this controversy because joinder of all Class members is

21 impracticable.  The prosecution of separate actions by individual members of the

22 Class would impose heavy burdens upon the courts and Defendants, and would

23 create a risk of inconsistent or varying adjudications of the questions of law and

24 fact common to the Class.  A class action, on the other hand, would achieve

25 substantial economies of time, effort and expense, and would assure uniformity of

26 decision as to persons similarly situated without sacrificing procedural fairness or

27 bringing about other undesirable results.

28

27.    The interest of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

28.    Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Fretted Instrument Products in interstate commerce throughout the United States.

29.    Defendants and their co-conspirators have engaged in unlawful activities that have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on, interstate commerce.

## THE FRETTED INSTRUMENT PRODUCTS MARKET

30.    The relevant product market in this case is sales of products in the Fretted Instrument Product category, which includes instruments, amplifiers, strings, and accessories for those instruments.

31.    Music product companies are generally understood to include companies which manufacture, supply or sell at retail musical instruments, accessories and products for amplifying and recording music.

32.    The relevant geographic market in this case is the United States of America.

33.    *Music Trades*, the only musical instrument market industry trade publication, reports that there are distinct product categories within the music product markets, including (1) Fretted Instrument Products; (2) pianos, including acoustic and digital pianos; and (3) percussion products, including drums, cymbals and mallets.

34.    Within the Fretted Instrument Product market, guitars are the most popular musical instrument.

CLASS ACTION COMPLAINT

7

35.    According to the 2007 Music Industry Census, the volume of sales of Fretted Instrument Products reached a plateau in 2005, and declined in 2006 through the remainder of the Class Period.

36.    Industry members have expressed concerns that increased imports of lower-priced Chinese products have forced down the price of Fretted Instrument Products.  For example, Kevin Jarvis of Gelb Music in Redwood City, California, at a *Music Trades* virtual roundtable published in February 2007, blamed industry problems, including declining unit prices, on "the market's saturation with cheap guitars literally everywhere."

37.    According to the 2009 Music Industry Census, the average unit price for guitars was $521 in 2001, and decreased to $309 in 2004.

38.    Yet, due to Defendants' collusive activities, the average unit prices of Fretted Instrument Products rose, during the Class Period, as demand decreased, contrary to standard economic principles, wherein a decline in demand should result in a decline in price.

39.    In 2008, the Fretted Instrument Product category retail dollar sales volume was approximately $1.55 billion.  Guitars account for nearly 70% of this market.

40.    According to IBISWorld Industry Report, *Musical Instrument & Supplies Stores in the US*: 45114 (Feb. 20, 2009), the music industry is generally composed of businesses with a low market share, with the exception of Guitar Center, which accounts for 33% of the market.

41.    *Music Trades* reports that in recent years, there has been a significant increase in market concentration, with the ten largest music product suppliers having increased their market share from approximately 42% in 2002 to 50% in 2008, with Guitar Center accounting for the majority of that 50%.

1    42.    In recent years, industry members have expressed concerns about

2 increased retail price competition for Fretted Instrument Products, and whether that

3 competition has been to the retailers' detriment.

4    43.    By virtue of their power to control prices and exclude competition in

5 the relevant market, Defendants, at all relevant times, possessed market power.

6 Moreover, at all relevant times, Defendants collectively possessed a dominant

7 share of the market for retail sales of musical instruments generally, and

8 specifically in the market for Fretted Instrument Products.

9    44.    Defendants at all relevant times possessed substantial market power in

10 the market for Fretted Instrument Products.  Specifically, Defendants sold their

11 Fretted Instrument Products at prices substantially in excess of marginal costs and

12 above the competitive price.  Defendants enjoyed high profit margins and

13 benefited from substantial barriers to market entry and growth.

14                          **INDUSTRY CONSOLIDATION**

15    45.    Guitar Center has grown through acquisitions.  Its current market

16 share – 33% – is more than five times larger than its 1997 market share of 6.1% of

17 the relevant market.

18    46.    Industry consolidation has occurred since 1999, when Guitar Center

19 bought "Musicians Friend," a leading catalogue and instrument retailer with nine

20 retail stores, and Sam Ash Music Corporation ("Sam Ash") acquired Manny's

21 Music and Thoroughbred Music.

22    47.    In April 2001, Guitar Center acquired American Music Group and its

23 12 retail stores, two mail-order catalogues and music accessory distributor.  In

24 2002, Guitar Center acquired M&M Music, a Southeastern retailer of musical

25 instruments to schools.  Also in 2002, Sam Ash acquired the top nine stores of the

26 Mars Music Chain.

27    48.    In mid-2005, Guitar Center bought Music & Arts Center and its 80

28 locations.  In 2006, Guitar Center acquired four Hermes Music stores in Texas.  In

CLASS ACTION COMPLAINT                                                            9

2007, Guitar Center acquired Victor's House of Music and Music 123. By the end of 2008, Guitar Center's annual sales had grown to $1.55 billion – approximately 22% of the overall musical instrument market's annual sales of $7 billion. According to *Music Trades* (August 2009), that year, Guitar Center had almost 50% of the total sales of the top 200 largest musical instruments retailers.

49.   Guitar Center's continued store expansion strategy has served to ensure its continued dominance in the relevant market. In 2005, for example, the number of U.S. music retailers decreased by 3,000, while the number of Guitar Center locations increased.

50.   Further reflecting the increased consolidation within the industry, Musical Merchandise Review's July 2009 issue reported that 171 outlets selling Fretted Instrument Products closed in 2008.

51.   According to *Music Trades*, Guitar Center is nearly 5 times the size of its nearest competitor.

52.   According to independent retailers, Guitar Center wields enormous power in the industry. In an interview in Musical Merchandise Review, April 2007 issue, Alan Levin of Chuck Levin's Washington Music Center said:

> The biggest concern is Guitar Center. They are many manufacturers' biggest customers and changes are being made . . . to suit them alone.

*Mass Merchants and Guitars: Market Builder or Category Killer?*, Musical Merchandise Review, April 2007.

53.   As Frank Hayhurst, CEO and founder of Zone Music, located in Cotati California, said, "As big as [Guitar center] is, what's a little manufacturer to do? Nor surprisingly, the do what [Guitar Center] demands."

54.   One NAMM member observed (as reported in the March 1, 2008 issue of *Music Trades*) "Guitar Center has too much leverage . . .." *Best Buy To Expand Music Store Concept: Consumer Electronics Giant Still Tight-Lipped*

1  *About Music Store Plans, But New Reports Suggest That It May Open As Many As*
2  *40 Music Locations By The End of 2008*, Music Trades, Mar. 1, 2008.

3      55.    Guitar Center, is, according to its own publicly-filed financial reports
4  in 2007, the largest customer of many of its suppliers and thus each manufacturer
5  depends on Guitar Center for a substantial portion of its sales of guitars.  Hayhurst
6  said that because of this, "suppliers finance [Guitar Center's] larger discount with
7  higher prices for smaller retailers."

8      56.    Guitar Center exerts its industry power through its NAMM
9  representation; through its Musicians Friend subsidiary, Guitar Center was
10 represented on the NAMM Board of Directors in 2005-2006.

11     57.    With over 200 stores in more than 40 states, Guitar Center dwarfs its
12 next largest competitor, which operates 45 stores in 12 states.

13     58.    In 2006, Yamaha was the leading musical instrument supplier in the
14 world.  Fender was the third-largest and Gibson was the sixth-largest.

15     59.    Like Guitar Center, Fender was represented on the NAMM Board of
16 Directors in 2005-2006.

17                **GOVERNMENT ANTITRUST INVESTIGATION**

18     60.    In March 2009, the Federal Trade Commission ("FTC") issued a
19 cease and desist order to NAMM, alleging that between 2005 and 2007, NAMM
20 organized various meetings and programs for its members, including Defendants,
21 at which retailers of musical instruments were permitted and encouraged to
22 exchange competitively sensitive information, strategies for implementing
23 minimum advertised pricing, and restrictions of retail price competition.  It also
24 issued subpoenas to Defendants.

25     61.    The FTC has ordered NAMM to cease and desist from:

26          (a)    Entering into, adhering to, enforcing, urging, encouraging,
27 advocating, suggesting, assisting or otherwise facilitating any Musical Product
28 Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any

1  combination, conspiracy, agreement or understanding between or among any

2  Musical Product Manufacturers or Musical Product Dealers relating to:

3              (i)    the retail price of any Musical Product;

4              (ii)    any term, condition or requirement upon which any

5  Musical Product Manufacturer or Musical Product Dealer deals, or is willing to

6  deal, with any other Musical Product Manufacturer or Musical Product Dealer,

7  including, but not limited to, Price Terms, margins, profits, or pricing policies,

8  including but not limited to Minimum Advertised Price Policies or Resale Price

9  Maintenance Policies; or

10             (iii)    the refusal to do business, or the reduction of business,

11  with particular Musical Product Manufacturers or Musical Product Dealers.

12         (b)    urging, encouraging, advocating, suggesting, coordinating,

13  participating in, or facilitating in any manner the exchange of information between

14  or among Musical Product Manufacturers or Musical Product Dealers relating to:

15             (i)    the retail price of Musical Products; or

16             (ii)    any term, condition or requirement upon which any

17  Musical Product Manufacturer or Musical Product Dealer deals, or is willing to

18  deal, with any other Musical Product Manufacturer or Musical Product Dealer,

19  including, but not limited to, Price Terms, margins, profits, or pricing policies,

20  including but not limited to Minimum Advertised Price Policies or Resale Price

21  Maintenance Policies.  *In the Matter of Nat'l Ass'n of Music Merchants, Inc.*, No.

22  C-4255, at 4-5 (F.T.C. Apr. 8, 2009) (Decision and Order).

23         62.    The FTC alleged that NAMM had permitted and encouraged acts

24  constituting Section 5 violations among its members and that the acts and practices

25  of NAMM "constitute unfair methods of competition in or affecting commerce in

26  violation of Section 5." *In the Matter of Nat'l Ass'n of Music Merchants, Inc.*, No.

27  C-4255, at 4-5 (F.T.C. Apr. 8, 2009) ("FTC Compl.").

28

63.   The FTC alleged that NAMM "organized meetings at which its members were encouraged to communicate, and did in fact share, information about prices and business strategy.  To the detriment of consumers, NAMM's conduct enhanced the members' ability to coordinate price increases for musical instruments."  Mar. 4, 2009 Press Release.

64.   The FTC also alleged that the "challenged conduct served no legitimate business purpose and resulted in no significant efficiency benefits," *id.*, and that absent appropriate relief "such acts and practices, or the effects thereof will continue or recur . . .."  FTC Compl. at 2.

65.   According to the FTC's complaint, at "meetings and programs [sponsored by NAMM], at which competing retailers of musical instruments were permitted and encouraged to discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices . . . competitors discussed the adoption, implementation and enforcement of minimum advertised price policies . . . and other competitively sensitive issues."  FTC Compl. at 2.

66.   The FTC also alleged that similar discussions were held among manufacturers.

67.   The FTC alleged that "NAMM's conduct crossed the line that divides legitimate trade association activities from unfair methods of competition."  Mar. 4, 2009 Press Release.

68.   The FTC concluded that the exchange of information disseminated within NAMM lacked a pro-competitive justification.

69.   At the same time, the parties settled the FTC's charges that NAMM had "permitted and encouraged" Section 5 violations.  *See* FTC Compl. at 2.

70.   According to the FTC press release announcing the settlement, "the FTC's proposed consent order is designed to remedy NAMM's anticompetitive conduct."  Mar. 4, 2009 Press Release.  Specifically, it prohibited NAMM from

1    coordinating the exchange of price information or coordinating certain discussions

2    concerning the conditions under which any manufacturer or dealer would buy or

3    sell products.

4        71.    Further, the settlement prohibited NAMM from facilitating an illegal

5    agreement among manufacturers or retailers, including agreements among

6    competitors relating to price, minimum advertised price, and terms of dealing.

7        72.    In April 2009, the Commission voted to accept the complaint and the

8    consent order by a vote of 4-0.

9                              **THE CONSPIRACY**

10       73.    Since 1999, leading manufacturers of Fretted Instrument Products

11   adopted minimum advertised price ("MAP") policies.  These are price floors set by

12   manufacturers, below which retailers are not supposed to advertise.

13       74.    Prior to the Class Period, these MAP policies were weakly enforced

14   and were set at relatively low prices.

15       75.    For example, George Hines, President of George's Music, Inc., who

16   served on the NAMM Board of Directors in 2004, said at the *Music Trades* virtual

17   roundtable that "MAP pricing should be the price you start at and go up from there.

18   Instead many people start at MAP and go down.  This is bad for the profitability of

19   the industry.  MAP could be the answer in keeping profitability in the industry

20   instead of declining profitability."

21       76.    During the Class Period, to minimize the loss of profits resulting from

22   declining retail prices, the retailer Defendants and manufacturer Defendants agreed

23   that (a) the manufacturer Defendants would raise the MAP price; (b) the retailer

24   Defendants would not sell below and/or discount off of MAP the price; and (c)

25   Defendants would strictly enforce these policies.

26       77.    During the Class Period, NAMM organized meetings and programs to

27   enable Defendants to meet and enter into a conspiracy to artificially reduce and

28   eliminate competition in the Fretted Instrument Product market.

78.   NAMM arranged and sponsored these meetings, set the agenda for the meetings, and helped steer the discussions toward the exchange of competitively sensitive information.

79.   During these meetings, musical instrument retailers that should have been competing with one another discussed strategies for raising retail prices.

80.   During these meetings, Defendants were "permitted and encouraged to discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices." FTC Compl. at 2.

81.   The purpose was to discuss strategies to raise retail prices. To do this, companies "exchanged information on competitively sensitive subjects including prices, margins," minimum advertised price policies and their enforcement. *See* Mar. 4, 2009 Press Release.

82.   These Retailers exchanged information on competitively sensitive subjects, including "the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail prices and margins; and other competitively sensitive issues." FTC Compl. at 2.

83.   Defendants' collusive conduct resulted in supra-competitive price levels for products in the Fretted Instrument Product market.

84.   Guitar Center, specifically, conspired with NAMM and the manufacturer Defendants to control prices and exclude or destroy competition in the Fretted Instrument Products market.

85.   In connection with the other Defendants' membership in NAMM, Defendants exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

86.   Defendants collusively and unlawfully imposed and enforced minimum resale price maintenance ("RPM") and MAP policies.

87. Guitar Center ordered its stores to stop discounting off of MAP, and required any store that sold Fretted Instrument Products below MAP to justify it in writing.

88. Under the RPM policy, manufacturers of Fretted Instrument Products would condition the sale (or continuation of sales) of its Fretted Instrument Products to dealers at or above a specified minimum dollar amount.

89. Under the MAP policy, the sale (or continuation of sales) of Fretted Instrument Products to dealers was conditioned on the advertisement or display of these products at or above a specified minimum dollar amount.

90. The higher MAP upon which Defendants agreed and the price retailer Defendants charged allowed the manufacturer Defendants to increase their wholesale prices to the retailer Defendants. According to Hines, this "ma[de] it possible for the retail network to sustain [its] growth."

91. The MAP policies NAMM imposed on music retailers and manufacturers are anticompetitive, and went beyond typical cooperative advertising programs, in which manufacturers place restraints on the prices dealers may advertise when the advertisements are funded in whole or in part by the manufacturer.

92. During NAMM meetings and programs, NAMM representatives determined the scope of the discussions and information exchanged, facilitating and enhancing discussions among competitors on the topics of retail prices and margins, how to enforce MAP policies, and other competitively sensitive issues.

93. The *Music Trades* roundtable discussion among industry dealers reflected that retailers knew that MAP served to limit competition. For example, Hines stated that the industry's "great challenge" was to get "all distribution channels [independents, national chains, mass merchants and internet providers] working together for the health of the industry." He stated that allowing market forces to control the industry would "not necessarily be for the better" and that a

"joint effort" was needed to keep independents at the center of the industry with "manufacturer support."

94.     Hayhurst stated during a *Music Trades* roundtable discussion that manufacturers would follow Guitar Center's lead.  He suggested that retailers unite with those "whom they used to consider their 'competitors' and create strategic alliances for their mutual benefit."

95.     Hayhurst also stated that "independents need to band together and favor manufacturers that provide a MAP system that allows for independents to stay in business."

96.     According to an October 23, 2008, *Wall Street Journal* article, Bradley Reed, sales manager for Musician's Advocate, Inc., said his company had very 'little choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor." *Instruments, Audio Gear Scrutinized In Price Probe*, Daily Herald, Wall ST. J., Oct. 23, 2008.

97.     In a publication called *Music Merchandise Review*, issue dated October 2008, it was reported that Anthem Music Group's head D. Kilkenny observed "over the past several years instrument prices seem to be increasing at a greater rate than that of inflation . . .." *Anthem Music Group Offers High Margin Instruments*, Musical Merchandise Review, Oct. 2008.

98.     The overall effect of Defendants' anticompetitive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced musical instruments in the Fretted Instrument Products market. As alleged above, had Defendants not improperly foreclosed or stifled actual or potential competitors from competing in the Fretted Instrument Products market and other markets for musical instruments, other actual or potential rival manufacturers would have achieved much greater sales than they actually did or

1   threatened to do, given the cheaper prices that they charged or could have charged,

2   and would have posed a far great competitive threat to Defendants.

### OTHER MARKET FACTORS SUPPORTING
### THE EXISTENCE OF THE CONSPIRACY

5   99.   Various other factors make the market for Fretted Instrument Products

6   particularly susceptible to an illegal conspiracy.

7   **Highly Concentrated Industry**

8   100.   A high degree of concentration facilitates the operation of a price-

9   fixing cartel because it makes it easier to coordinate behavior among co-

10   conspirators, and it makes it more difficult for customers to avoid the effects of

11   collusive behavior.

12   101.   There is substantial concentration among the firms that manufacture

13   the products in the relevant market.

14   102.   According to a 2008 *Music Trades* report, the music industry had a

15   gross margin of 30% versus approximately 22% gross margins for consumer

16   electronics.  Despite the high gross margins, the industry has been consolidating

17   rather than attracting new entrants.  Even mass market retailers have decided not to

18   compete with Defendants on the same scale and scope.

19   103.   Guitar Center has grown through acquisitions.  Between 1997 and

20   2007, its market share more than quintupled.  Today, it is the only national chain

21   and dominates the Fretted Instrument Products market, with its 210 stores plus the

22   industry's largest mail-order operation, and sales of approximately $2.0 billion.

23   104.   Independent retailers could not compete with nationwide and/or

24   multiregional chains because the retailers could not compete on price.  Guitar

25   Center and other chain retailers were thus able to raise prices at supra-competitive

26   levels.

27   105.   Without such high concentration, the presence of unfettered

28   competition from actual or potential competitors, which were selling lower-priced

1   musical instruments, would have forced Defendants to lower the prices for their

2   musical instruments in order to remain competitive and/or to counter a perceived

3   threat of additional entry.

4   **Significant Barriers To Entry**

5   106.   A collusive arrangement that raises product prices above competitive

6   levels would, under normal circumstances, attract new entrants seeking to benefit

7   from the supra-competitive pricing.  Where, however, there are significant barriers

8   to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the

9   operation of a cartel.

10   107.   There are significant barriers to entry in the Fretted Instrument

11   Product market.  New entrants to the market must make large investments in

12   inventory and retail selling space.

13   108.   The March 1, 2008 issue of *Music Trades* reported one NAMM

14   member's observation that:

15   > To generate reasonable sales volume, you need a lot of
16   > SKUs.  I'm not sure they [Best Buy, then attempting to
        enter the music retailing market] will be able to achieve
17   > the kind of volume they're hoping for in just 2500 square
        feet of space.
18

19   *Best Buy Set To Expand Music Store Concept: Consumer Electronics Giant Still*

20   *Tight-Lipped About Music Store Plans, But New Reports Suggest That It May*

21   *Open As Many As 40 Music Locations By The End Of 2008*, Music Trades, Mar. 1,

22   2008.

23   109.   Morningstar's retail analyst, Brady Lemos, said in 2008 that the

24   retailing music business is taking "up a lot of real estate."  *Best Buy To Open In-*

25   *Store Music Centers*, MSNBC, July 28, 2008,

26   http://www.msnbc.msn.com/id/25875917.  Guitar Center reports that its average

27   large store selling space is 15,000-25,000 square feet and stocks approximately

28

11,000 SKUs.  By contrast, Best Buy has decided to enter the market in only a very limited way: 2,500 square foot store with stock of approximately 1000 SKUs.

110.   Stores that are larger in size benefit from economies of scale.  The existence of these larger stores negatively impacts existing small and independent operators, who find it increasingly difficult to compete against stores with such large spaces.

111.   Moreover, new manufacturers would have difficulty competing – even at a much lower price – with Defendants, who have spent years building their own reputations to those of higher quality manufacturers of Fretted Instrument Products.

112.   Additionally, the emergence of mass market retailers such as Wal-Mart provides an additional barrier to entry, since these mass market retailers can heavily discount music supplies, preventing small and independent operators from competing.

113.   IBISWorld reports, with regard to the barriers to entry: "[f]or new entrants to be successful, they would need to establish upstream supply relationship with manufacturers and wholesalers in order to secure high quality, low priced stock."  *IBISWorld* at 18.  The conspiracy alleged herein prevents new entrants from commencing such relationships.

114.   The Fretted Instrument Product market is characterized by significant barriers to entry, which enhanced Guitar Center's dominance and allowed Defendants to exercise and maintain control over prices of Fretted Instrument Products.

115.   Absent Defendants' exclusionary conduct, barriers to entry would have been lower, which would have enabled existing or new competitors to enter or expand their positions in the market for Fretted Instrument Products and would have attracted existing or potential competitors to the Fretted Instrument Products market.

116.   As a result, Defendants would have been threatened by potential competition if they did not reduce their prices, were it not for the conspiracy.

**Lack of Reasonable Substitutes**

117.   The lack of available substitute products gives a potential cartel a greater chance of being successful.  When few or no substitutes for a price-fixed item are available, producers of the item can raise product prices without losing significant sales.  Consumers have little choice but to pay the new, higher price.

118.   There are no available substitutes for Fretted Instrument Products at any price.

119.   Therefore, a small but significant non-transitory price increase in the Fretted Instrument Product market would not result in a loss of sales within this product market to sales in other music product categories.

**Opportunities to Conspire**

120.   David P. Wales, the FTC's Acting Director of the Bureau of Competition said at the time of the settlement, "[t]rade associations properly provide many services for their members, but enabling competing sellers to work together to coordinate higher prices for their products is not a legitimate function." Mar. 4, 2009 Press Release.

121.   During the class period, NAMM was the industry's vehicle through which the Fretted Instrument Product market controlled prices in the United States. Specifically, Wales said NAMM was "facilitat[ing] anticompetitive agreements or coordination." *Id.*

122.   Most U.S. manufacturers, distributors, and dealers of musical instruments are NAMM members.  NAMM works for its members by "promoting consumer demand for musical instruments, lobbying the government, offering seminars, and organizing trade shows.  [In the United States,] NAMM sponsors two major [] trade shows each year, where manufacturers introduce new products

1   and meet with dealers" and competing manufacturers, distributors and retailers of

2   musical instruments meet and discuss issues of concern to the industry. *Id.*

3       123.   Between 2005 and 2007, NAMM:

4           Organized various meetings and programs at which

5           competing musical instrument retailers were encouraged
        to discuss strategies for implementing manufacturers'

6           minimum advertised pricing (MAP) policies, restricting

7           retail price competition, and securing higher retail prices.

8   *Id.*

9       124.   In the United States, NAMM sponsors two major trade shows each

10   year, where manufacturers introduce new products and meet with dealers.  In

11   addition, NAMM's trade shows provide competing manufacturers, distributors and

12   retailers of musical instruments an opportunity to meet and discuss issues of

13   concern to the industry.  During the Class Period, these meetings were used for

14   improper purposes.

15       125.   NAMM also hosted and/or sponsored trade shows, town hall

16   meetings, and other events in which NAMM had final authority over the invite list.

17       126.   A NAMM Global Summit ensued during the Class Period, which was

18   attended by leaders in the music products industry.  The Sixth Global Summit was

19   held in 2007 in Carlsbad, California.  NAMM organized and hosted this Global

20   Summit, which provided opportunities for Defendants and their co-conspirators to

21   meet and discuss the inner-workings of the conspiracy.

22       127.   During these meetings, Fretted Instrument Product retailers that

23   should have been in competition with one another were permitted and encouraged

24   to exchange information and discuss strategies for implementing minimum

25   advertised price policies, the restriction of retail price competition, and the need for

26   higher retail prices.

27

28

CLASS ACTION COMPLAINT

128.   Representatives of NAMM determined the scope of information exchanged and discussed by selecting the moderator and setting the agenda for these programs.

129.   NAMM shows are considered an indispensable resource by music product retailers.  In a February 2007 interview a member was quoted in Musical Merchandise Review:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary.
>
> Owners and key personnel should be at NAMM . . . the education seminars are priceless.  The interaction with the industry people and colleagues is also priceless.

*Where Are We Headed . . . Analyzing Industry Prospects For 2007*, Musical Merchandise Review, Feb. 2007.

130.   According to the FTC, at these NAMM-sponsored events, NAMM members "discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail prices and margins; and other competitively sensitive issues."  FTC Compl. at 2.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

131.   During the Class Period, Plaintiff and the Class purchased Fretted Instrument Products directly from Defendants.  As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Fretted Instrument Products they purchased.  Plaintiff would have been able to, *inter alia*, purchase less-expensive Fretted Instrument Products had potential competitors been able to engage in unfettered competition.  The prices that Plaintiff and the other Class members paid for Fretted Instrument

1   Products during the Class Period were substantially greater than the prices that

2   Plaintiff and the Class members would have paid absent the illegal conduct alleged

3   herein because the prices of Fretted Instrument Products were artificially inflated

4   by Defendants' illegal conduct and because Class members were deprived of the

5   opportunity to purchase Fretted Instrument Products at competitive (lower) prices.

6   Plaintiff and the Class have thus been damaged by the overcharges imposed upon

7   them.

8       132.   Defendants' practices have had the following anticompetitive effects,

9   among others, in the relevant market:

10          (a)   Competition in the relevant market has been unreasonably

11   restrained, suppressed, and, in some cases, destroyed;

12          (b)   Prices charged to Plaintiff and the Class for Fretted Instrument

13   Products have been fixed, maintained, or stabilized at higher, artificially derived,

14   non-competitive levels;

15          (c)   Potential competitors have been restrained from entering into

16   the relevant market and have been prevented from competing effectively against

17   Defendants;

18          (d)   Purchasers of Fretted Instruments Products have been denied

19   the benefits of competition in a free and open market;

20          (e)   Competition in establishing prices of Fretted Instrument

21   Products has been unlawfully restrained, suppressed, and eliminated; and

22          (f)   Upon information and belief, Defendants have enjoyed, and

23   will continue to enjoy, ultra competitive profits to the detriment of competitors and

24   purchasers of musical instruments.

25       133.   The injury sustained by Plaintiff and the Class is the payment of

26   supra-competitive prices for Fretted Instrument Products.  This is an injury of the

27   type that the antitrust laws were meant to punish, prevent, and redress.

28

134.   The anticompetitive effects of Defendants' conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

## CAUSE OF ACTION

**(Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)**

135.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

136.   Beginning in 2005, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants and their co-conspirators, Defendants entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

137.   In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of Fretted Instrument Products sold in the United States.

138.   As a result of Defendants' unlawful conduct, prices for Fretted Instrument Products were raised, fixed, maintained and stabilized in the United States.

139.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and/or concerted action among Defendants and their co-conspirators.

140.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including but not limited to:

(a)   participating in meetings and conversations to discuss the prices and supply of Fretted Instrument Products;

1          (b)     communicating in writing and orally to fix target prices, floor

2  prices, and price margins for Fretted Instrument Products;

3          (c)     exchanging competitively sensitive information among each

4  other to facilitate their conspiracy, including minimum advertised pricing,

5  strategies for raising retail prices, restricting retail price competition;

6          (d)     agreeing to manipulate the prices and supply of Fretted

7  Instrument Products sold in the United States in a manner that deprived direct

8  purchasers of free and open competition; and

9          (e)     selling Fretted Instrument Products to customers in the United

10  States at noncompetitive prices.

11      141.  As a result of Defendants' unlawful conduct, Plaintiff and the Class

12  were injured in their businesses and/or property in that they paid more for Fretted

13  Instrument Products than they otherwise would have paid in the absence of

14  Defendants' unlawful conduct.

15      142.  Defendants' anticompetitive conduct is either a *per se* violation of the

16  antitrust laws, or otherwise an unreasonable restraint of trade in violation of

17  Section 1 of the Sherman Act, 15 U.S.C. § 1.

18                    **PRAYER FOR RELIEF**

19    **WHEREFORE**, Plaintiff prays that:

20      A.     The Court determines that this action may be maintained as a class

21  action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure

22  with respect to the claims for damages, and declaring Plaintiff as the representative

23  of the Class and his counsel as counsel for the Class;

24      B.     The Court declares the conduct alleged herein to be unlawful in

25  violation of the federal antitrust laws;

26      C.     Plaintiff and the Class recover treble damages to the extent such are

27  provided by the law;

28

1      D.      Defendants be enjoined from continuing the illegal activities alleged

2  herein;

3      F.      Plaintiff and the Class recover their costs of suit, including reasonable

4  attorneys' fees and expenses as provided by law; and

5      G.      Plaintiff and the Class be granted such other, further, and different

6  relief as the nature of the case may require or as may be determined to be just,

7  equitable and proper by this Court.

8                    **<u>DEMAND FOR JURY TRIAL</u>**

9      Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff

10  demands a jury trial as to all issues triable by a jury.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated:   October 30, 2009          Respectfully submitted,

2

3

4                                      _____
                                       Mark Labaton (Bar No.159555)
5                                      KREINDLER & KREINDLER LLP
                                       707 Wilshire Boulevard
6                                      Los Angeles, CA 90017
                                       Telephone: (866) 386-2531
7                                      Facsimile.:  (213) 622-6019

8

9                                      Hollis L. Salzman
                                       Kellie Lerner
10                                     LABATON SUCHAROW LLP
                                       140 Broadway
11                                     New York, NY 10005
                                       Telephone: (212) 907-0700
12                                     Facsimile: (212) 818-0477

13

14                                     Mark Shane
                                       SHANE AND WHITE, LLC
15                                     1676 Route 27
                                       Edison, NJ 08817-3449
16                                     Telephone: (732) 819-9100
                                       Facsimile: (732) 572-9641
17

18                                     *Attorneys for Plaintiff Craig Kennedy
                                       and the Proposed Class*
19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

## CV09- 7985 DDP (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[_] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[_] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)         NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Mark Labaton (Bar No. 159555)
KREINDLER & KREINDLER LLP
707 Wilshire Boulevard, Suite 4100
Los Angeles, California 90017

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG KENNEDY, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC.; GUITAR CENTER, INC.; YAMAHA CORPORATION OF AMERICA;FENDER MUSICAL INSTRUMENTS CORPORATION; and GIBSON GUITAR CORPORATION,<br>DEFENDANT(S). | CASE NUMBER<br><br>CV-09-07985 DDP (CWx)<br><br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): <u>NATIONAL ASSOCIATION OF MUSIC MERCHANTS,INC.;GUITAR</u>
<u>CENTER, INC.; YAMAHA CORPORATION OF AMERICA; FENDER MUSICAL INSTRUMENTS</u>
<u>CORPORATION; and GIBSON GUITAR CORPORATION,</u>

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Mark Labaton_____, whose address is _707 Wilshire Boulevard, Suite 4100, Los Angeles, California 90017_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.


Clerk, U.S. District Court

Dated: _____NOV - 2 2009_____

By: _____
Deputy Clerk

CHRISTOPHER POWERS

SEAL

*(Seal of the Court)*


*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*


CV-01A (12/07)                                                    SUMMONS

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| CRAIG KENNEDY, on behalf of himself and all others similarly situated | NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC.; GUITAR CENTER, INC.; YAMAHA CORPORATION OF AMERICA; FENDER MUSICAL INSTRUMENTS CORPORATION; and GIBSON GUITAR CORPORATION |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Mark Labaton  Mark Labaton (Bar No. 159555) KREINDLER & KREINDLER LLP 707 Wilshire Boulevard, Los Angeles, CA 90017   Tel: (866) 386-2531 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No     ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sections 1 and 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 2, 15 and 26

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE/PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV09  07985**

FOR OFFICE USE ONLY:     Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                                    CIVIL COVER SHEET                                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): see attached

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or

☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Louisiana |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, CA (Guitar Center, Inc.) Buena Park, CA (Yamaha Corporation of America) | San Diego County (National Association of Music Merchants, Inc.) Arizona (Fender Musical Instruments Corporation) Tennessee (Gibson Guitar Corporation) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, CA | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  10/30/09

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

Related Cases

| Case | Judge |
|------|-------|
| *Mark O'Leary v. Guitar Center, Inc. et al.*<br>Case No. CV-7015-GW-PJW | Honorable George H. Wu |
| *Allen Hale v. Guitar Center, Inc. et al.*<br>Case No. CV-06897-GW-PJW. | Honorable George H. Wu |
| *Niranjan Parikh v. Guitar Center, Inc. et al.*<br>Case No. CV-07254-GW-PJW. | Honorable George H. Wu |
| *Kate MacWilliamson v. Guitar Center, Inc. et al.*<br>Case No. CV-07375-GW-PJW. | Honorable George H. Wu |
| *Agustin Cervantes v. Guitar Center, Inc. et al.*<br>Case No. CV-07526-GW-VBK. | Honorable George H. Wu |
| *William S. Poff, Jr. v. Guitar Center, Inc. et al.*<br>Case No. CV-07614-RGK-AJW. | Honorable Gary Klausner |
| *Scott Cook v. Guitar Center Inc. et al.*<br>Case No. CV-07630-ODW-AGR. | Honorable Otis D. Wright, II |
| *Gerald Logsdon v. Guitar Center, Inc. et al.*<br>Case No. CV-07783-DSF-FMO. | Honorable Dale S. Fischer |